(123 App. Div. 113.)

### LAVIN v. THOMAS et al.

(Supreme Court, Appellate Division, Fourth Department. January 8, 1908.)

1. WILLS—TESTAMENTARY CAPACITY—TESTATOR'S UNDERSTANDING AS TO HIS PROPERTY.

The test of a man's ability to dispose of his property by will depends on his conception of his obligations to those who naturally are the objects of his bounty, and on his adequate comprehension of the condition and nature of his property and of the scope and import of the testamentary provisions.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 96–100.]

2. SAME—SUFFICIENCY OF EVIDENCE.

Evidence examined, and *held* sufficient to show that testator possessed testamentary capacity.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 137–161.]

3. SAME—NATURE AND EXTENT OF TESTAMENTARY POWER.

The statutes put no restraint on the distribution among persons of a man's property by will, barring the property rights accruing to the widow.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 15–17.]

Williams, J., dissenting.

Appeal from Special Term, Cayuga County.

Action by Mary Lavin against John A. Thomas, as executor of the will of Patrick Lavin, deceased, and others, to determine the validity of the probate of the will. From a judgment for plaintiff, adjudging the will void, and from an order denying a new trial, defendants appeal. Reversed, and new trial ordered.

Patrick Lavin, of the town of Venice, in the county of Cayuga, executed his last will and testament on the 31st day of March, 1905, and died in October following, and the will was admitted to probate December 7th of that year in the Surrogate's Court of said county. This action was commenced forthwith on the entry of the decree by a daughter of a deceased son of the testator, pursuant to section 2653a of the Code of Civil Procedure, for the purpose of having the validity of the probate of said will determined. The executor of the will and all other parties interested in the estate of said deceased are made parties defendant. A trial was had in October, 1906, and at the close of the plaintiff's case the court directed a verdict for the defendants, which was reversed upon appeal to this court, on the ground "that the case should have been submitted to the jury." Upon the last trial one question

was submitted to the jury, "Was Patrick Lavin, on March 31, 1905, competent to make a will?" The jury answered the question in the negative and found a verdict for the plaintiff. The decedent left, him surviving, three children and the descendants of two others. By his will he gave the plaintiff $25; to each of the four Flynn grandchildren $10, adding, "Their mother, Mary Flynn, having already in her lifetime received her full share in my estate;" to his son Thomas $2,000; and the residue to his son James, subject to the burden of caring for William, who was mentally incompetent.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Frank C. Cushing, for appellants.
Amasa J. Parker, for respondent.

SPRING, J. Patrick Lavin was a sturdy, thrifty farmer, and at the time of his death owned a farm of 322 acres and nearly $11,000 in personal property. He lived to be 86 years of age, had been a soldier in the Civil War for 3 years, and after his discharge from the army devoted his energies to carrying on his farm in Cayuga county and acquiring property. He was active and energetic, well known in the vicinity where he lived, sharp at a trade, and of excellent judgment. There is no proof that he was ever overreached in any business transaction, or that he made a bad investment or an injudicious sale of the products of his farm, although he managed that and his other property up to the time of his death. The testimony upon which the charge of lack of testamentary capacity is based consists of a few isolated facts, nearly all of which are susceptible of explanation consistent with sufficient ability to make the will propounded. I will briefly summarize the chief features of this testimony.

In 1900 the decedent agreed to loan one Seymour Parks $1,600, accepting as security a mortgage upon the farm of Parks. Two or three weeks later Lavin denied that he promised to make this loan. It developed, however, that judgments had been entered against Parks before he saw Lavin the second time, that there was unpaid interest on the existing mortgage, and also that he filed a petition in bankruptcy shortly thereafter. Parks also testified that in 1902 or 1903 Lavin passed his house, saying he was going home, although traveling in the opposite direction. Parks was preparing to drive over to the home of his former father-in-law, who was then dead, and the route was near the residence of Lavin, so he rode along with Parks. He kept reiterating, "The old man is dead," referring to the father-in-law. When near home he said things appeared to look familiar. There were one or two other lapses of a similar kind proved, which in and of themselves are not rational, and yet they are not unusual in men of advanced age who are still vigorous mentally. Several witnesses testified that in 1899, six years before Lavin died, he was arrested for cruelty to his horses. His hired man was using them, and there were callouses or sores upon their shoulders, made by the collars which they wore. He paid a fine of $5, and said he supposed he had a right to use his team as he saw fit. Another witness testified that he purchased of Lavin two calves, and when they were delivered a poor one was substituted for a better one; and at another time Lavin

had arranged to purchase a binder, and his wife came into the field and called him an "old fool," and he told the agent not to ship it; and there was a similar transaction in regard to a mower. Subsequently he purchased the binder. While his conduct is characterized as irrational by this agent, he did not seem to have any hesitancy about making the sale to Lavin, and said the question of his competency to do business "never entered my head at the time." In 1905 an assessor told him he intended to increase his assessment of personal property, and the old man said the assessors were trying to rob him, and he vigorously repeated the statement several times. These are the chief transactions which it is claimed justify the verdict that Lavin was incompetent to make a will. Whenever any of these witnesses had any business dealings with him, he comprehended what he was doing, made the correct change, and exercised good judgment.

There were three witnesses to the will, all old acquaintances of Lavin—one a former chairman of the board of supervisors, who was the cashier of the bank where Lavin had long transacted business, a merchant where he traded, and an old-time friend; and they testified to his mental soundness and to his understanding of the business he was doing. Lavin was a man of great physical strength and was actively engaged in business during his whole life. His farm produced large crops each year, and he sold these himself, received the money, attended to the delivery of the goods, purchased and sold stock, and there is no proof that he lacked judgment in the larger transactions, and he was accurate in the payment and receipt of money and in making change. He loaned money, received payments of principal and interest, reinvested what he received, and no suggestion of improvidence or of foolhardy investments appears in the record. He was well known, and his neighbors and the leading men of the town and vicinity in which he resided testified to numerous transactions running down to the time of his death, and several after the execution of the will, all indicating not merely mental capacity in the abstract, but vigor, shrewdness, and alertness in each transaction. His regimental comrades, the cashier of the bank with which he did business, the men who had borrowed money of him, the merchants where he purchased goods, the blacksmith who did his work, the miller who purchased his wheat and buckwheat, the agent who insured his property, the men who bought the crops and stock he sold, the neighbors who were in friendly intercourse with him day by day, the priest of the church to which he contributed, the physicians who knew him, and others, testified to many transactions with him, and all united in saying the acts were rational; and each occurrence is more satisfactory evidence of his intelligence than the characterization of it, even by these witnesses who were so well qualified to judge of his conduct.

The test of a man's ability to dispose of his property by will depends upon his conception of his obligations to those who naturally are the objects of his bounty and upon his adequate comprehension of the condition and nature of his property and of the scope and import of the testamentary provisions. The weight of the evidence is that Lavin measured up with this standard. For years he had not been on friendly terms with the plaintiff. Her father, his son, had died many

years before the testator. He had not called on her in 10 years at her home with her mother in Auburn, although at times in the city. She did not visit him. He and his wife had been ordered out of the household of the Flynns, and their relations were unpleasant. His sons, James and William, had always lived with him. He wished to provide for the maintenance of the unfortunate one, and James he always trusted and relied upon. In any event, if he was competent to make a will, the power was lodged with him to dispose of, as he desired, the property which he had earned and saved by long years of economy and foresight. The statutes of the state permit one to use this form of transferring his property, to be effective upon his death, and they put no restraint upon the distribution to be made among persons, barring the property rights accruing to the widow. The motives which induce a man in making a testamentary disposition of his property to prefer one relative to another may not always be disclosed; but, if he is free from improper influence and possesses the requisite capacity, what controlled his preference is unimportant. If Patrick Lavin, with his extended acquaintance and business activity for a farmer, was incompetent to make a will, there must be abundant evidence of his mental weakness; but the weight of the evidence in this record is decidedly in favor of his testamentary capacity.

The judgment should be reversed, and a new trial ordered, with costs to abide event.

Judgment reversed, and a new trial ordered upon the facts, with costs to appellants to abide event. All concur, except WILLIAMS, J., who dissents.